IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ANTHONY DAPKUS | No. 15 C 6395 |
| Plaintiff, | Judge Virginia M. Kendall |
| v. | |
| CHIPOTLE MEXICAN GRILL, INC. | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Anthony Dapkus brought this suit against his former employer Chipotle Mexican Grill, Inc. ("Chipotle") pursuant to 42 U.S.C. § 1981 alleging that Chipotle discriminated against him on the basis of his race. Dapkus, an African American, alleges that his rights were violated against because he was subjected to racially discriminatory epithets, was physically threatened, and was treated less favorably than employees who were not African American. Chipotle now moves for summary judgment arguing that no reasonable jury could find that Dapkus was discriminated against in violation of Section 1981. For the following reasons, Chipotle's Motion for Summary Judgment [29] is denied.

## BACKGROUND

Chipotle, a "fast casual" restaurant chain that specializes in Mexican fare, owns multiple restaurants in the Chicagoland area, including in Chicago's South Loop neighborhood (the "Restaurant"). (Dkt. No. 33 at ¶ 2.) Every Chipotle restaurant is operated by a set of crew members who prepare and serve food, clean, and maintain the restaurant. (*Id*. at ¶ 6.) There are four levels of management that oversee the crew members, comprising of (in ascending order of

1

responsibility) the Kitchen Manager, Service Manager, Apprentice Manager, and General Manager. (*Id*. at ¶ 8.) The managers' responsibilities are split up as follows: the Kitchen Manager is typically responsible for the inventory and preparation of food; the Service Manager is in charge of customer service and the dining room; the Apprentice Manager assists the General Manager; and the General Manager is responsible for the overall operation of the restaurant, including the hiring and firing of employees. (*Id.* at ¶¶ 8-12.) Finally, Restaurateurs, who are above General Managers, are responsible for the field operations of one or more restaurants and report directly to a Team Leader, who is in turn responsible for multiple restaurants within a geographic region. (*Id*. at ¶ 13.)

During Dapkus's employment at the Restaurant, Joseph Medina was the Kitchen Manager; Leticia Nava and Andre Velez were the Service Managers; Jesus Gonzalez and then Katherine Vega were the Apprentice Managers; Cindy Gutierrez was the General Manager; Patricia Alvarez was the Restauranteur; and Stephanie Vazquez was the Team Leader. (*Id*.)

### A. Chipotle's Policies and Procedures[1]

Chipotle maintains and updates its "Respectful Workplace Policy" which includes an Equal Employment Opportunity (EEO) policy, Code of Conduct, and Anti-Discrimination, Harassment and Sexual Harassment policy. (*Id*. at ¶ 14.) Employees are permitted to anonymously report inappropriate behavior, including discriminatory or harassing behavior, by

---

[1] Chipotle moves to strike several of Dapkus's responses to its Rule 56.1(a)(3) Statement of Material facts. (*See* Dkt. No. 43.) The requirements for responses "are not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted." *See, e.g., Freight Train Advert., LLC v. Chicago Rail Link, LLC*, No. 11 C 2803, 2012 WL 5520400, at *2 (N.D. Ill. Nov. 14, 2012) (quoting *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000)). In addition, the Court may strike responses that "fail[] to adequately cite to the record [or are] filled with irrelevant information, legal arguments, and conjecture." *Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006). Dapkus did not file a substantive response to Chipotle's motion to strike; rather he simply stated that he "stands by the record submitted to this Court." (Dkt. No. 48.) Consequently, the Motion to Strike [43] is granted in part. Specifically: the objected to portions of ¶¶ 14, 21, and 39 are stricken because they misconstrue the record; the objected to portions of ¶¶ 15, 20, and 23 are stricken because they are not responsive; and ¶¶ 16, 17, 22, 24, 26, 31, 32, 34, 35, 39, and 41 are not stricken.

submitting a complaint through two separate avenues: the Respectful Workplace Hotline and Chipotle Confidential. (*Id.* at ¶ 15.) The Crew Handbook, which Chipotle updated in January 2014, includes requirements that employees are to treat fellow employees and customers with respect and that discrimination or harassment on the basis of race is prohibited. (*Id.* at ¶ 16.)

### B. Dapkus's Employment at Chipotle

Cindy Gutierrez, the General Manager for the Restaurant, hired Dapkus as a crew member at the location approximately one week prior to its opening on November 6, 2013. (*Id.* at ¶¶ 11, 19-20.) Gutierrez was the only Chipotle employee involved in the hiring process. (*Id.* at ¶ 11.) Prior to Restaurant's opening, Dapkus participated in a six-day training and orientation. (*Id.* at ¶ 20.) During his orientation, Dapkus watched a video regarding Chipotle's Respectful Workplace Policy, received paperwork regarding the Policy, and instructions regarding restaurant operations, including how to prepare and maintain the food. (*See* Dkt. No. 34-1 at 102-104.) During Dapkus's employment, 10 of the 23 employees at the Restaurant were African American.[2] However, no African American employee held a management position at the Restaurant. (Dkt. No. 33 at ¶¶ 22, 23.)

#### 1. Use of Harassing Language at the Restaurant

Dapkus alleges that during his employment, words such as "nigger," "nigga," and "gorilla" were used by African American and Latino employees.[3] (*See id.* at ¶ 24; Dkt. No. 43 at 8.) In particular, Velez and Medina used such terms, and other employees, including Walker and

---

[2] Dantrall Swayzer, Brandon Copeland, Jimeese Walker, Essie Lindsay, Tony Simmons, and David Finney were some of the African American employees who worked with Dapkus at the Restaurant. (Dkt. No. 33 at ¶ 23.)
[3] According to the witnesses in the case, there is a meaningful difference between the terms "nigger" and "nigga." For example, Walker, an African American employee stated that "nigger" is universally viewed as a racially discriminatory term while "nigga" is more commonly viewed as a slang term that employees used with one another. (*See, e.g.* Dkt. No. 34-3 at 38:9-17 (Walker testifying: "Q. And what are – why is that definition different? A. It goes to slang. Q. Okay. A. We will in a world of slang or if you want me to say ebonics. And like I said, in today's time in ebonics, the slang word nigga means friend. The word nigger, we already know what that means.").) Regardless, there is no question that the parties dispute when and which terms were used in the Restaurant. (*See, e.g.,* Dkt. No. 44 at ¶¶ 45, 46, 59.)

Vega, testified that they heard other employees use these terms in the Restaurant. (*See* Dkt. No. 44 at 1-2; *see also, e.g.,* Dkt. No. 34-2 at 115:17-116:4 (Vega testifying: "Q. You previously testified that you heard Mr. Medina use the word nigger at the Chipotle South Loop restaurant. Did you ever hear anyone else use the word nigger other than Mr. Medina? A. Oh, yes, Andre and Angel for sure, Dantrall. There was another guy, I can't remember his name, this is the one I was referring to before, too, but I cannot remember his name for the life of me. And he was African American if I am not mistaken."); *id.* at 116:9-11 ("Q. Did you ever witness any Hispanic employee refer to an African American employee as a gorilla? A. I believe that was also Joseph."); Dkt. No. 34-1 at 284:19-285:2 (Dapkus testifying that Medina told him on at least ten occasions "Don't run out of meat today, nigger, not on my clock.").) Dapkus further testified that he personally heard Gutierrez, the General Manager, use the terms "nigger" and "nigga," though he acknowledges that no other deposed employee testified that they specifically heard Gutierrez use those terms. (*See* Dkt. No. 33 at ¶ 33, Response.) However, the parties dispute (1) whether the terms were used directly towards Dapkus[4] or other African Americans, (2) whether the terms were used in a collegial or racially harassing manner, and (3) whether Dapkus himself used the words nigga or nigger. (*Id.*; Dkt. No. 33 at ¶¶ 24, 27, 31, 32; Dkt. No. 44 at ¶ 45.)

Dapkus also testified that he told the managers not to use the term nigger. In particular, he states that Velez responded by saying "oh, shut up, nigger." (*See* Dkt. No. 34-1 at 206:1-12 ("Q. And did you ever tell [Velez] to not use that word?" A. Yes, I told, I told all of them. Well, not all of them, but I told the managers that it wasn't cool when they use the word. 'Oh, shut up, nigger,' like just brushed me off. And I also told the manager that came over there from another

---

[4] During his deposition, Dapkus alleged that every manager and some of the crew members, African American and Latinos alike, harassed him because he was African American. (*See* Dkt. No. 34-1 at 110.) He specifically testified that Medina, the Kitchen Manager, would harass him while they were cutting meats: "He would come up to me and he'd be like, 'Nigger this' or 'Nigger that.' Like he'd tell me 'Don't run out of meat today not on my clock, nigger,' stuff like that. He would just be saying the slick stuff and using that term." (*Id.* at 111:1-13.)

4

restaurant, Angel, I told him about the situation.  Q. So, which of the managers did you ask not to use the word?  A. I told them all not to use it.").)

  2. January 8, 2015 Knife Incident

Dapkus also testified that Medina threatened him with a knife behind the grill, located directly behind the line where the customers are served their food, on January 8, 2015.  (*See* Dkt. No. 33 at ¶ 25.)  According to Dapkus, he and Medina were cutting meat and vegetables and Medina told him "Don't run out of meat.  Don't run out of meat today, nigger, not on my watch," and then said "Don't make me use this," in reference his knife.  (*See* Dkt. No. 34-1 at 179:2-16.)  No one else witnessed this interaction.  (*Id*.)  According to the Aloha Shift Details – a record of employees signing in and out of work – Dapkus and Medina did not work together on that date.  (*See* Dkt. No. ¶ 26 ("On January 8, 2014, Dapkus worked from 7:20 am until 3:02 pm and Medina worked from 3:09 pm until 12:30 am.").)  Dapkus disputes the accuracy of the Aloha records, citing in particular Vega's statement that "managers will change the times and hours punched in and out to be in line with the matrix that's designed by Chipotle.  So I mean, this was produced by Chipotle, but I don't know if it's accurate."  (*See* Dkt. No. 34-2 at 121:12-17.)  Dapkus continued to work with Medina for more than one week before reporting the incident.  (Dkt. No. 33 at ¶ 25.)  He testified that he was delayed in reporting the incident because Alvarez was not at the Restaurant until over a week later.  (Dkt. No. 34-1 at 180:14-22.)

  3. Disparity in Employee Treatment

Although the parties generally agree about the staff's racial makeup, they disagree regarding whether the Hispanic employees were treated more favorably than the African American employees. Vega, for example, testified that workers of Latino or Mexican descent received better shifts, more hours, and more leeway from Gutierrez and Alvarez. (*See* Dkt. No.

5

34-2 at 128:9-13.) On the other hand, Chipotle takes the position that no witnesses specifically testified to African American employees being treated less favorably than other employees. (*See* Dkt. No. 33 at ¶ 29.)

### C. End of Employment

On February 28, 2014, Dapkus quit[5] following a verbal altercation with a transgender customer during which Dapkus told the customer to "go find yourself." (*Id*. at ¶ 21; *see also* Dkt. No. 34-1 at 141:22-149:15 (Dapkus testifying that he quit after the incident).) Dapkus acknowledged during his deposition that making such a statement to a transgender person is demeaning, but testified that he did not know it was demeaning at the time that he made the statement. (Dkt. No. 34-1 at 149:16-20.) During his termination meeting with Gutierrez and Velez, Dapkus states that he told Gutierrez "You know what? I already know that you all want to fire me or want to get rid of me anyway. So just give me my check and I'll just go." (*Id*. at 160:3-9.) Although the parties agree that Dapkus's last day of work at Chipotle was February 28, 2014, Chipotle's employment records indicate that his last day of employment was May 8, 2014, and that the reason for the end of his employment was a "voluntary failure to report." (*See* Dkt. No. 44 at ¶ 74.)

### STANDARD OF REVIEW

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating a motion for summary judgment, the Court's primary function is not to "evaluate the weight of the

---

[5] Despite unequivocally stating that he quit his job following the altercation, Dapkus alleges that Gutierrez actually terminated him. (*See* Dkt. No. 33 at ¶ 22, Response.) However, Gutierrez's testimony was that Dapkus's employment was terminated on that day, not that she personally terminated him. (*See* Dkt. No. 33-4 ("Q. On the day that you spoke to Mr. Dapkus when the verbal disagreement occurred with the customer, did you tell him you were going to have to terminate his employment? A. Yes. Q. Did you ever complete any termination paperwork for Mr. Dapkus? A. Yes, but it was a period of time later, so that's the reason he couldn't have a check there at the moment.").)

6

evidence or to determine the truth of the matter," but to determine whether there is a general issue for trial. *See, e.g., U.S. Commodity Futures Trading Comm'n v. New World Holdings, LLC*, No. 10 C 4557, 2012 WL 983790, at *2 (N.D. Ill. Mar. 21, 2012) (quoting *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994)). "A factual dispute is 'genuine' only if a reasonable jury could find for either party." *Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 599 (7th Cir. 2014) (internal quotation marks and citation omitted). The party moving for summary judgment bears the initial burden of production to show that no genuine issue of material fact exists. *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001). This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* (citing *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 978 (7th Cir. 1996)). Upon such a showing, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). These facts must demonstrate that the genuine issue is material and not simply a factual disagreement between the parties. *Id.* (quoting *Logan*, 96 F.3d at 978). The "nonmovant fails to demonstrate a genuine issue for trial 'where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Id.*

## DISCUSSION

"To survive a summary-judgment motion, an employee alleging racial harassment must show: (1) he was subject to unwelcome harassment; (2) the harassment was based on his race; (3) the harassment was severe or pervasive so as to alter the conditions of the employee's work environment by creating a hostile or abusive situation; and (4) there is a basis for employer liability." *Williams v. Waste Mgmt. of Illinois*, 361 F.3d 1021, 1029 (7th Cir. 2004); *see also, e.g., Smith v. Farmstand*, No. 11-CV-9147, 2016 WL 5912886, at *6 (N.D. Ill. Oct. 11, 2016).

Chipotle does not dispute that the alleged harassment was based on Dapkus's race, but contends that Dapkus cannot show that he was subject to unwelcome harassment, that the harassment created a hostile or abusive situation, or that there is a basis for employer liability.

## I. Unwelcome Harassment

Chipotle argues that summary judgment is appropriate because Dapkus cannot show that the alleged harassment was unwelcome.[6] (*See* Dkt. No. 30 at 3.) "Whether words or conduct were unwelcome presents a difficult question of proof turning largely on credibility determinations committed to the factfinder." *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 476 (7th Cir. 2004). However, a plaintiff's own actions – including whether he or she objected to the allegedly harassing words or conduct or participated in the conduct – are relevant to determine whether the alleged harassment was welcome. *Id.* (affirming district court's holding that racial harassment was unwelcome where record indicated that plaintiff protested racist speech even though the plaintiff used racist language himself); *Reed v. Shepard*, 939 F.2d 484, 491-2 (7th Cir. 1991) (affirming district court's granting of summary judgment on sexual harassment claim where record showed that plaintiff's own "preferred method of dealing with co-workers was with sexually explicit jokes, suggestions and offers" and that the plaintiff never complained about the allegedly harassing conduct).

Chipotle first contends that Dapkus cannot show that the alleged harassment was unwelcome because he "engaged in behavior similar to that which he now claims was unwelcome and offensive." (Dkt. No. 30 at 4.) Specifically, Chipotle argues that Dapkus not only used the words "nigger" and "nigga," but also that he "would refer to women as 'bitches' and hoes,' including statements such as 'oh, that bitch is fine,' and 'oh fuck that hoe.'" (*Id.*) In

---

[6] As an initial point, Chipotle does not address Dapkus's counterarguments in its Reply. (*See* Dkt. 45-1.) Although failure to respond to argument typically results in waiver, *see Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010), the Court nevertheless reviews the issues set forth in the parties' briefing.

support of their position, Chipotle cites to testimony from Dapkus himself in which he admits that he did use the "N word" in "joking" way. (*See* Dkt. No. 34-1 at 112:3-12 ("Q. Do you use the 'N' word? A. No, ma'am. Q. Have you ever used it? A. Like amongst – like it's also a slang word for it but like – and for another race to use it, it would be like degrading towards the African American community. Yes, like joking I have like, my like, fellow African Americans, yes, I have used it before.").) However, Dapkus testified that he never used any of those terms at work, *see id*. at 113:15-18, and that neither term (nigger or nigga) could be used in a positive way. Other coworkers testified that they never heard Dapkus use either term. (*See* Dkt. No. 34-3 at 42:18-21 (Walker testifying: "Q. Okay. So when you're working with Anthony and others, did he use the 'N' word with the 'a', did you hear him use that word? A. No."); Dkt. No. 34-2 at 107:23-108:1 (Vega testifying: "Q. Did you ever hear Tony use the 'N' word? A. No, because I didn't work that close. I mean, if he said it, I never heard him.").)

In addition, Chipotle's inability to point to uncontroverted evidence that Dapkus used the term "nigger," and not only "nigga," is significant given the parties' agreement that the former term, regardless of situation, carries an extremely negative connotation because of its history. *See also, e.g., Bailey v. Binyon*, 583 F. Supp. 923, 927 (N.D. Ill. 1984) ("The use of the word 'nigger' automatically separates the person addressed from every non-black person; this is discrimination *per se*."). Rather, much of the evidence that Chipotle relies upon is testimony from other employees that Dapkus used the "N" word. However, the employees are never asked to specify which term the "N word" refers to, and also consistently stated that "nigga" can be used in a racially harassing way depending on how it is said and the context of its use. There is also testimony that indicates that Dapkus reacted negatively to the use of either term, regardless of whether the term was used in a friendly way. (*See, e.g.,* Dkt. No. 34-3 at 42:22-43:5 (Walker

testifying that Dapkus would sometimes make a face when he heard the terms, even if used in a friendly manner).) Dapkus further testified that he felt uncomfortable and constantly harassed throughout his employment because of the rampant use of racially derogatory terms. Although Chipotle cites to testimony from other employees that the terms were never used in a harassing manner, a jury could credit witness testimony, including Dapkus's, stating the opposite and find that the use of such terms (it is undisputed that at least "nigga" was used throughout the Restaurant) was derogatory. *See Hrobowski*, 358 F.3d at 476 ("whether words or conduct were unwelcome presents a difficult question of proof turning largely on credibility determinations committed to the factfinder.").

Second, Chipotle argues that Dapkus welcomed the alleged harassment because he "allowed, without complaint, most of the activity he now characterizes as racial harassment." (Dkt. No. 30 at 4-5.) The parties do not dispute that Dapkus complained to Alvarez regarding Medina's pointing a knife at him and the use of "nigger" and "nigga" around the restaurant. Although Chipotle attempts to minimize the significance of Dapkus's complaints to Alvarez by noting that Dapkus was not sure that Alvarez understood his complaints because she did not speak English well, Chipotle fails to point to any authority that the failure of a supervisor to understand a complaint fully somehow undermines the fact of the complaint itself. Moreover, Dapkus testified that he also complained to Vega, Angel, and Velez about the use of the term "nigger" throughout the Restaurant. Such allegations, particularly in light of the disputed record, are sufficient to indicate a dispute of material fact. *Hrobowski* proves instructive. In that case, the Seventh Circuit held that a reasonable jury could find that Hrobowski did not welcome similar conduct (the use of the word "nigger" in particular) because he complained about racist language and jokes in the workplace:

> Hrobowski, by contrast, points to competent evidence that he did object to the type of racist language to which he was subjected. In his deposition testimony, Hrobowski points out that he complained to managers Mark Stier and Pat Murley about racial language and jokes in the workplace. Although it is unclear when Hrobowski made these protests or exactly what he said to Stier and Murley (more about that later), a reasonable jury could conclude from this evidence that Hrobowski did not welcome racist speech, at least when he was the victim of that language.

*Id.* at 476. A reasonable jury could find that Dapkus's complaints establish that he did not welcome the speech. Chipotle's argument that his testimony is uncorroborated and therefore should be disregarded is rejected because Dapkus's statements may create a material dispute regarding whether he welcomed the speech.[7]

As such, given the numerous factual disputes in the record, a reasonable jury could find that Dapkus did not welcome the harassing language.[8] As such, summary judgment on this first ground is inappropriate.

## II. Hostile or Abusive Work Environment

In order to establish the "hostile work environment" element, the plaintiff must submit evidence showing that he was subjected to conduct "so severe or pervasive as to alter the conditions of his employment and create an abusive working environment." *Quantock v. Shared Mktg. Servs., Inc.*, 312 F.3d 899, 903 (7th Cir. 2002) (citation and quotations omitted). This is a fact intensive inquiry, *see Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993), and the Court must consider "all the circumstances," including "the frequency of the discriminatory conduct;

---

[7] *See Navejar v. Iyiola,* 718 F.3d 692, 697 (7th Cir. 2013) ("[W]e long ago buried—or at least tried to bury—the misconception that uncorroborated testimony from the non-movant cannot prevent summary judgment because it is self-serving.") (citations and internal quotations omitted); *Roberts v. Separators, Inc.*, 172 F.3d 448, 451 (7th Cir. 1999) (holding that plaintiff's self-serving statements could create a material dispute regarding his performance); *Schlosser v. Culligan Int'l Corp.*, 23 F.3d 410 (7th Cir. 1994) (same).

[8] Even if undisputed evidence supported Chipotle's claim that Dapkus's own use of the racially derogatory language precludes him from surviving summary judgment, Chipotle does not contend that the January 8, 2015 incident during which Medina threatened Dapkus with a knife was welcome based on Dapkus's own behavior, undermining its position. Instead, Chipotle argues that the Court should disregard Dapkus's allegations because they are based on only his own, unsubstantiated testimony. However, a jury may not be surprised that no one else heard or saw this incident based the significant activity in the grill area, and as explained above, a jury could credit Dapkus's testimony and find that the incident occurred even without corroboration. *See, e.g., Smith*, 2016 WL 5912886, at *7.

its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance," through no single factor is required. *Robinson v. Sappington*, 351 F.3d 317, 329 (7th Cir. 2003) (quoting *Harris*, 510 U.S. at 23.) For a plaintiff to prove that he or she was exposed to a severe or pervasive hostile environment, the plaintiff "must prove that the words or actions to which he was subjected were both objectively and subjectively hostile." *Id*.

### A. Objectively Hostile

Dapkus argues, based on his own testimony and testimony from other employees, that racially offensive terms, including "nigger," "nigga," and "gorilla", were often used towards him and at the Restaurant in general. Indeed, as discussed above, Dapkus, Walker, and Medina, among others, testified that many of the employees used such language, although the parties dispute whether the use of such language was in a negative or positive way. As "a plaintiff's repeated subjection to hearing [the word nigger] could lead a reasonable factfinder to conclude that a working environment was objectively hostile," such allegations are sufficient. *Hrobowski*, 358 F.3d at 477 (further recognizing that "[g]iven American history, we recognize that the word 'nigger' can have a highly disturbing impact on the listener.").

In opposition to this conclusion, Chipotle argues that Dapkus's allegations are uncorroborated and are therefore insufficient or otherwise fail to establish harassment "so severe and pervasive that it alter[ed] the conditions" of his employment. (Dkt. No. 30 at 6-7.) Chipotle's first argument, that Dapkus's testimony is uncorroborated, is not supported by the record. For example, Vega specifically testified that she heard at least four other individuals use the "N" word and heard Velez himself use it multiple times. Additionally, she reprimanded other employees about their use of the "N" word. (*See* Dkt. No. 34-2 at 132:11-17 ("Q. All right.

When you were reprimanding Angel, Dantrall, and Brandon about the use of the 'N' word, what did you say to them? A. I told them that they could not be talking in that way in -- you know, when they're working in the back of the house, other people could hear, you know, they shouldn't use that language.").) Based upon that testimony, in addition to Dapkus and Walker's testimony detailed above, a reasonable jury certainly could find Dapkus's allegations both true and reliable. Furthermore, the fact that Vega testified that she reprimanded other employees for the use of the terms and that Dapkus testified that he complained to various managers undermines Chipotle's argument that no employee testified that the words were used in an offensive manner. In addition, Chipotle's recurring argument that summary judgment is proper because Dapkus's testimony is uncorroborated is incorrect because a jury could credit Dapkus's testimony and find in his favor. *See, e.g., Smith*, 2016 WL 5912886, at *7.

Turning to Chipotle's second contention, as an initial point, Dapkus need not establish that the harassment was both so severe *and* pervasive; rather, "one or the other will do." *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 808 (7th Cir. 2000). Nevertheless, the crux of Chipotle's argument is that summary judgment is appropriate because Dapkus cannot establish that the allegedly harassing conduct unreasonably interfered with his work performance. (*See, e.g.,* Dkt. No. 45 at 4 (Chipotle arguing that "[t]o survive summary judgment, Plaintiff *must* demonstrate that the conduct unreasonably interfered with his work performance.") (emphasis added).) However, whether the conduct interfered with Dapkus's work performance is just one of the factors to be considered and is not required. *See Harris*, 510 U.S. at 23 (holding that whether the work environment was hostile or abusive can be determined by looking at all circumstances, which "may include…whether it unreasonably interfered with an employee's work environment."). Rather, when viewing all of the factors and circumstances, a jury could

determine that the harassment was severe or pervasive because (1) the use of racially derogatory terms was common and more than a mere utterance, (2) Dapkus complained to managers to no avail, and (3) Dapkus felt physically threatened and humiliated because of the conduct and words of the other employees. *See Robinson*, 351 F.3d at 329 (setting out factors); *see also Lambert v. Peri Formworks Sys., Inc.*, 723 F.3d 863, 869 (7th Cir. 2013) (holding that the plaintiff met the requirement where the record reflected that coworkers "referred to workers on *multiple* occasions by names that a trier of fact could see as racial slurs.") (emphasis in original).

### B. Subjectively Hostile

In determining whether a workplace was subjectively hostile, a court must "inquire into whether the plaintiff perceived her environment to be hostile or abusive." *Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 695 (7th Cir. 2001); *see also Hrobowski*, 358 F.3d at 477 ("As to the subjective component of our inquiry, all that Hrobowski has to establish is that he perceived the environment to be hostile or abusive."). Chipotle does not appear to challenge that Dapkus meets the requisite standard and the analysis on this issue is straight-forward. As discussed above, Dapkus has asserted and a jury could find that the words that Dapkus heard and the conduct that he was subjected to were unwelcome. Dapkus also alleges that he felt threatened and humiliated. As such, there is an issue of material fact regarding subjective hostility.

Accordingly, Chipotle's motion for summary judgment as to this prong is rejected.

### III. Employer Liability

Chipotle also contends that summary judgment is appropriate because Dapkus cannot establish employer liability. "The standard for employer liability hinges on whether the harasser was the plaintiff's supervisor. Harassment by a supervisor of the plaintiff triggers strict liability, subject to the possibility of an affirmative defense where the plaintiff suffered no tangible

14

employment action. Conversely, the employer may be found liable for a hostile work environment created by an employee who was not the plaintiff's supervisor only where the plaintiff proves that the employer has 'been negligent either in discovering or remedying the harassment.'" *Hrobowski*, 358 F.3d at 477 (quoting *Parkins v. Civil Constructors of Illinois, Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998)).

A.  **Supervisor Harassment**

"'Supervisor' is a legal term of art for Title VII purposes, and an employee merely having authority to oversee aspects of another employee's job performance does not qualify as a supervisor in the Title VII context."[9] *See, e.g., Park v. Pulsarlube USA, Inc.*, No. 14 C 4242, 2016 WL 3551652, at *5 (N.D. Ill. June 30, 2016) (quoting *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 506 (7th Cir. 2004) *overruled on other grounds by Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016)). "[A] supervisor means someone who has the power to hire, fire, demote, promote, transfer, or discipline an employee." *See, e.g., Park*, 2016 WL 3551652, at *5 (citations and quotations omitted).

Here, Chipotle can only be held liable under the supervisor standard if Dapkus shows that Gutierrez – the only manager that was responsible for all hiring and firing decisions, *see* Dkt. No. 33 at ¶ 12 – was his harasser. *Hrobowski*, 358 F.3d 478. Here, Dapkus does, in addition to alleging that Gutierrez subjected him and other African American crew members to less favorable treatment, state that he personally heard Gutierrez use the terms "nigger" and "nigga" during his employment. Although the parties dispute if and how many times Gutierrez used such terms, such allegations are sufficient to create a dispute of material fact because Gutierrez's use

---

[9] Section 1981 claims are analyzed in the same manner as claims brought pursuant to Title VII of the Civil Rights Act. *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010); *see also Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 736 (7th Cir.2006) (retaliation claims under Section 1981 and Title VII are subject to the same methods of proof and analysis).

15

of the terms, even if not directed at Dapkus, could establish employer liability on the basis of supervisor conduct. *Cf. Hrobowski*, 358 F.3d at 478 (declining to find supervisor liability where, unlike here, the plaintiff failed to point to evidence that a "person with the power to influence the terms and conditions of *his* employment made such remarks.") (emphasis in original). Moreover, Gutierrez's use of the terms could have influenced the way other employees acted towards Dapkus; specifically, if and how often the other employees used such terms around or with reference to Dapkus. Accordingly, because Dapkus has at least circumstantial evidence that Gutierrez, as his supervisor, used racially derogatory terms, summary judgment is inappropriate.

### B. Employee Harassment

Dapkus may also establish employer liability by showing that Chipotle was negligent in either discovering or remedying harassment by an employee. *Hrobowski*, 358 F.3d at 478. Chipotle "will not be liable for the hostile environment absent proof that it failed to take appropriate remedial measures once apprised of the harassment." *Hostetler*, 218 F.3d at 809. An employer is generally not considered to be apprised of the harassment "unless the employee makes a concerted effort to inform the employer that a problem exists," *Silk v. City of Chicago*, 194 F.3d 788, 807 (7th Cir. 1999), though an employer "could be charged with constructive notice where the harassment was sufficiently obvious." *Hrobowski*, 358 F.3d at 478 (citing *Mason v. S. Illinois Univ. at Carbondale*, 233 F.3d 1036, 1046 (7th Cir. 2000)). Alternatively, notice that is sufficient to trigger employer liability "must be given to either someone with authority to take corrective action or, at a minimum, someone who could 'reasonably be expected to refer the complaint up the ladder to the employee authorized to act on it.'" *Lambert*, 723 F.3d at 866-67 (quoting Parkins, 163 F.3d at 1037).

16

Here, Dapkus contends that he both apprised Chipotle of the harassment and that the harassment was so obvious that Chipotle should have had constructive notice of it. With regard to his first argument, it is undisputed that Dapkus did not use either of Chipotle's anonymous hotlines – Respectful Workplace Hotline or Chipotle Confidential – for submitting complaints. However, and despite Chipotle's argument to the contrary, failure to use an established reporting mechanism is not fatal; rather, the analysis then depends on whether the employer received notice through the plaintiff's complaints to his superiors. *See Parkins*, 163 F.3d at 1037 ("Because Parkins apparently delayed using the only mechanism for complaint that indisputably existed (filing a grievance with the Teamsters Union), we must determine whether she reported the alleged harassment to anyone who had the authority to deal with the harassment or at least "to someone who could reasonably be expected to refer the complaint up the ladder to the employee authorized to act on it.").

Dapkus argues that his numerous complaints to the managerial staff regarding the constant use of the terms "nigger" and "nigga" throughout his employment were sufficient to put Chipotle on notice of the harassment. (*See* Dkt. No. 34-1 at 206:1-12.) He specifically testified that he complained to Velez and the other managers to stop using the terms and was told "oh, shut up nigger." (*Id.*) Moreover, the parties do not dispute that Dapkus complained to Alvarez regarding Medina pointing a knife at him and the use of "nigger" and "nigga" around the restaurant.[10] Although the parties dispute how often Dapkus lodged his complaints, based on the disputed record, a fact finder could find that Dapkus's multiple complaints to the managerial staff were sufficient to put Chipotle on notice of the alleged harassment. Given that the parties

---

[10] Chipotle again attempts to argue that Dapkus's complaints to Alvarez should be discounted or somehow construed as evidence that he did not adequately raise the issue because he was not sure that she understood English. (*See* Dkt. No. 45 at 6.) However, as discussed above, because Chipotle fails to provide any authority in support of this contention, it is rejected.

do not dispute whether Chipotle took any remedial action (despite the fact that Dapkus expressly alleges that Chipotle did not, *see* Dkt. No. 36 at 13), Dapkus meets the standard for employee liability.

In opposition, Chipotle, citing *Hrobowski*, argues that Dapkus's allegations were too vague to put it on notice of his racial harassment claims. (*See* Dkt. No. 30 at 13-14.) However, Chipotle's reliance on *Hrobowski* is misplaced. In that case, the Seventh Circuit affirmed the district court's grant of summary judgment in similar factual circumstances because the plaintiff did "not tell the district court the substance of his reports." *Id*., 58 F.3d at 479 (holding: "We therefore agree with the district court's conclusion that Hrobowski 'failed to direct [the district court's] attention to any facts which would show that Defendants were negligent in discovering or addressing racial harassment in the workplace.'"). Unlike in *Hrobowski*, however, Dapkus's complaints were clearly related to racial harassment. Moreover, a reasonable jury could find, depending on how it weighed the evidence and witness testimony, that Dapkus requested that the managers stop using "nigga" and "nigger" and admonish the other employees to do the same. *Cf*. *Montgomery*, 626 F.3d at 392 (finding that defendant could not be found to have knowledge where "Montgomery complained of general unfairness in task assignments and of employee delinquency, but these complaints did not provide notice of any racial harassment concerns."). As such, because Dapkus's complaints specifically related to racial harassment (both in words and through conduct), Chipotle's argument that his complaints were too vague is rejected.

## **CONCLUSION**

For the reasons stated above, Chipotle's Motion for Summary Judgment [29] is denied.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: 1/4/2017